HORIZONS INTERNATIONAL, INC.
and Kenchem, Inc.

v.

Malcolm BALDRIDGE, Secretary, United States Department of Commerce; William French Smith, Attorney General of the United States; and United States Department of Justice.

No. 85–0955.

United States District Court,
E.D. Pennsylvania.

Jan. 3, 1986.

M. Norman Goldberger, Seymour Kurland, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., Daniel R. Shulman, Minneapolis, Minn., Joseph M. Alioto, San Francisco, Cal., for plaintiffs.

Margaret L. Hutchinson, Asst. U.S. Atty., Philadelphia, Pa., Vincent Alventosa, Rosemary T. Rakas, J. Stephen Simms, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

KATZ, District Judge.

This is the first case to seek judicial review of a grant of immunity from antitrust law, by the Secretary of Commerce and the Attorney General, under The Export Trading Company Act of 1982, 15 U.S. C.A. §§ 4001–4021 (West Supp. 1985) ("The Act"). The Act is designed to increase United States exports through efficient export trade cooperation, without anticompetitive conduct in the domestic market. To accomplish these goals, Congress gave the Secretary of Commerce the difficult task of certifying, with the concurrence of the Attorney General, that proposed export activities will not have anticompetitive effects in the domestic market. The purpose of certification is to give export trade associations and companies the comfort of certainty by providing an advance ruling of their immunity under the antitrust laws for the certified conduct. Congress gave the Secretary and the Attorney General ninety days to grant or deny requests for such certificates of review.[1]

This case involves a challenge to the grant of a certificate of review to a joint venture called Chlor/Alkali Producers International ("Chlor/Alkali"). This joint venture is composed of four major producers of two industrial chemicals, chlorine and alkali. Plaintiffs—Horizons International, Inc. and Kenchem, Inc.—have presented evidence relevant to their claim that Chlor/Alkali is not eligible for a certificate of review. They point to the rather checkered past of antitrust violations in the chlor-alkali industry. In fact, outstanding consent decrees generated by past anti-

---

**1.** This time period can be modified to some extent. In some instances, the Secretary and the Attorney General can shorten the period by granting expedited review. They can also extend the period by requesting additional information from an applicant and suspending the running of the time period until the information arrives.

trust litigations may bar the very conduct permitted by the certificate. Moreover, an extensive F.T.C. proceeding regarding possible anticompetitive practices in the market for products that may be related to chlorine and alkali is presently pending against a member of the certified joint venture. The fact that exports of chlorine are minimal arguably evidences its inclusion in the certificate as a cover for domestic anticompetitive collusion. Finally, plaintiffs have offered evidence that the historical anticompetitive conduct of the chlor-alkali industry is continuing to this day. The plaintiffs therefore urge that issuance of the certificate, and the consequent grant of antitrust immunity, was improper because Chlor/Alkali cannot meet the Act's certification standards. Plaintiffs contend that the certificate will facilitate domestic anticompetitive practices, and that these practices will harm plaintiffs.

The defendants—the Secretary of Commerce, the Attorney General, and the Department of Justice—have filed a Motion for Summary Judgment. They contend that there are no genuine issues of material fact and that they are entitled to summary judgment as a matter of law. Defendants have also filed a Motion to Dismiss. They contend that this Court lacks subject matter jurisdiction over the Department of Justice and the Attorney General and that those parties should be dismissed from this case.

I find that the grant of a certificate of antitrust immunity to the Chlor/Alkali joint venture without the agencies' reasoned analysis of the issues identified in my order is arbitrary, capricious, and an abuse of discretion. I also find that the present administrative record is inadequate because it fails sufficiently to address important aspects of the problem. Therefore, I vacate the agencies' grant of a certificate to the joint venture and remand these proceedings to the Secretary and the Attorney General to consider the issues I have identified.

The Export Trading Company Act of 1982 is designed to "increase United States exports of products and services by encouraging more efficient provision of export trade services to United States producers and suppliers...." *See* 15 U.S.C.A. § 4001(b) (statement of purpose). These purposes are furthered by several measures, including establishment of "an office within the Department of Commerce to promote the formation of export trade associations and export trading companies, ... [and] by modifying the application of antitrust laws to certain export trade."[2] *See id.*

Sections 4012 and 4013 of the Act provide for application for, and issuance of, certificates of review. *See id.* at §§ 4012–13. These certificates confer significant benefits upon their holders, including immunization from antitrust liability for certified conduct. Specifically, no criminal or civil action may be brought

> under the antitrust laws against a person to whom a certificate of review is issued which is based on conduct which is specified in, and complies with the terms of, a certificate issued under Section 4013 ... which certificate was in effect when the conduct occurred.

*See id.* at § 4016. Such benefits are meant to minimize uncertainty regarding antitrust liability for joint export activities, and thereby promote such activities. *See* H.R. Rep. No. 637(II), 97th Cong., 2d Sess. 7,

---

2. This case is concerned with portions of the Act directed towards the promotion and certification of export trade entities. The Act includes other provisions; in all, it is composed of four titles. Title I sets forth the Act's overall purposes and definitions, and establishes the Department of Commerce office for promotion of export trade entities. Title II concerns the role of banks in the formation and financing of export trade entities. Title III contains the Act's certification provisions. Title IV amends the Sherman Act and the Federal Trade Commission Act to curtail the application of antitrust laws to foreign business transactions by U.S. companies, so long as the transactions are free of anticompetitive domestic effects. *See generally* Bruce & Pierce, *Understanding the Export Trading Company Act and Using (Or Avoiding) Its Antitrust Exemptions,* 38 Bus.Law. 975, 975–77 (1983).

*reprinted in* 1982 U.S.Code Cong. & Ad. News 2431, 2444, 2444.

Commerce Department Guidelines provide an extensive description of the benefits of a certificate of review. According to the guidelines,

[t]he two most significant benefits of a certificate of review are virtual immunity from government antitrust suits and procedural advantages in private suits. The certificate holder and the members identified in the certificate, have virtual immunity from federal and state government civil and criminal antitrust or unfair competition suits.... This virtual immunity extends to the export conduct specified in the certificate and carried out during the effective period of the certificate in compliance with its terms and conditions. The procedural advantages that a certificate of review provides to the certificate holder and its members in private actions by persons who claim to have been injured by the certified conduct are: (1) a reduction in liability from treble to single damages, (2) a shorter statute of limitations for bringing an action, (3) a rebuttable presumption that the certified conduct is permissible, and (4) the recovery by a prevailing certificate holder of the costs of defending the suit, including a reasonable attorney's fee.

This virtual immunity and the procedural advantages ... can reduce antitrust risks and uncertainty by deterring lawsuits of dubious merit. Moreover, a certificate of review can remove the uncertainty and risks associated with "gray-area" conduct by giving an exporter an opportunity to confirm the often qualified conclusions of counsel that particular export conduct is not likely to violate the antitrust laws.... [P]rotections can apply not only to the actual operation of an export entity but also to its planning activities.

*See* Revised Guidelines, 50 Fed.Reg. 1786, 1787 (1985).[3]

Certificates are obtained by written application to the Secretary of Commerce. Applications must specify the export trade conduct to be certified, and must also supply information about the applicant and its proposed conduct. *See* 15 U.S.C.A. § 4012; 15 C.F.R. § 325.3 (1985). Within ten days after an application is submitted, the Secretary must publish in the Federal Register an announcement of the application. *See* 15 U.S.C.A. § 4012(b). The announcement must identify the applicant and describe the conduct to be certified. *Id.* These publication procedures are intended to provide opportunities for notice and comment by parties interested in, or affected by, the proposed certification. *See* 15 C.F.R. § 325.6 (1985). Because issuance of a certificate requires the concurrence of the Attorney General, the Secretary must provide the Attorney General with a copy of the application, any information submitted to the Secretary in connection with the application, and any other information the Secretary deems relevant, including information regarding the applicant's market share in the line of commerce embraced by the proposed export conduct. *See* 15 U.S.C.A. § 4012(b)(2). This information must be provided to the Attorney General within seven days after the application is submitted. *See id.* The Secretary must also pass along any comments received through the notice and comment procedures. *See* 15 C.F.R. § 325.6 (1985).

No certificate may be issued less than thirty days after notice of the application is published in the Federal Register. *See* 15 C.F.R. § 325.5 (1985). A certificate normally is granted or denied within ninety

---

**3.** References to agency materials generally will be to guidelines published at 50 Fed.Reg. 1786 (1985) and rules and regulations codified at 15 C.F.R. Part 325 (1985). These guidelines and regulations apply to all applications filed after January 11, 1985. The certification at issue in this case took place between October 30, 1984 and January 25, 1985. It was therefore covered by earlier guidelines published at 49 Fed.Reg. 15937 (1983), and rules and regulations published at 48 Fed.Reg. 10596 (1983) (to be codified at 15 C.F.R. Part 325 (interim rules)). There are no pertinent substantive differences between the earlier and later materials; however, the later materials provide a clearer and more deailed picture of the agencies' practices.

days after the application is received. *See* 15 U.S.C.A. § 4013(b). This time period may be shortened if an applicant requests expedited review due to "a special need for prompt disposition." *See id.* at § 4013(c). Grants of expedited review are within the discretion of the Secretary and the Attorney General. *See* 15 C.F.R. at § 325.8 (1985). The determination period may also be extended beyond the normal ninety day period. Extensions may be deemed necessary by the Secretary and Attorney General; in such cases, "[i]f the ... applicant agrees, the Secretary may take up to an additional thirty days to determine whether to issue a certificate." *See id.* at § 325.5. Extensions may also result if the Secretary requests supplemental information from the applicant. In such cases, the clock is stopped from the time the request is made until the supplemental information has been received and deemed complete. *See id.* at § 325.3.

Issuance of a certificate rests upon an applicant's ability to establish that it meets the Act's certification standards. These standards require that the applicant's proposed export conduct will

(1) result in neither a substantial lessening of competition or restraint of trade within the United States nor a substantial restraint of the export trade of any competitor of the applicant,

(2) not unreasonably enhance, stabilize, or depress prices within the United States of the goods, wares, merchandise, or services of the class exported by the applicant,

(3) not constitute unfair methods of competition against competitors engaged in the export of goods, wares, merchandise, or services of the class exported by the applicant, and

(4) not include any act that may reasonably be expected to result in the sale for consumption or resale within the United States of the goods, wares, merchandise, or services exported by the applicant.

15 U.S.C.A. § 4013(a). These standards "encompass the full range of the antitrust laws," *see* H.R.Rep. No. 924, 97th Cong., 2d Sess. 26, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2501, 2510; *see also* 50 Fed. Reg., *supra,* 1790 (citing legislative history). They are intended to "ensure that conduct that is likely to have substantial anticompetitive effects within the United States will not be certified." *See* 50 Fed. Reg., *supra,* at 1790.

The agencies' assessment of an applicant's conformance with these standards is based upon analysis of materials submitted by the applicant. Applicants are required to submit annual reports, a description of domestic and export operations, identities and affiliations of the applicant's members and personnel, a description of the goods or services the applicant exports or proposes to export, market share information, a description of the export conduct to be certified together with a statement of antitrust concerns related to the proposed conduct, specifications of the nature of any agreements or exchanges of information involved in the proposed conduct, and "[a]ny other information that the applicant believes will be necessary or helpful to a determination of whether to issue a certificate under the standards of the Act."[4] *See* 15 C.F.R. § 325.3 (1985).

This information, together with any other information the agencies obtain, is analyzed to determine whether the applicant's proposed conduct is likely to "violate an antitrust law otherwise applicable to export trade for which damages may be recovered as a remedy." *See* 50 Fed.Reg., *supra,* at 1790. This determination is made by reference to the Act's four standards, *see id.* at 1789–92; *see also* 15 U.S.C.A. § 4013(a). Under the first standard, which looks for substantial lessening of competition or restraint of trade, "the analysis will in most instances look to the overall purpose and effect of the activities the domestic mar-

---

**4.** As plaintiffs point out, it is somewhat anomalous to rely upon applicants to address antitrust concerns. An applicant intending to abuse an export certificate by engaging in anticompetitive domestic conduct is unlikely to reveal its motives or to supply information that might hinder its certification.

ket."[5] *See id.* at 1791. The second standard, which looks for unreasonable price effects, focuses upon the "purpose and likely effect upon domestic prices of the proposed export conduct.... [A]n increase in domestic prices that results from anticompetitive behavior directed at the domestic market will be unreasonable." *See id.* Under the third standard, which looks for unfair methods of competition, the agencies check for "proposed conduct that is anticompetitive and likely to substantially restrict the exports of U.S. export competitors...." *See id.* Under the fourth standard, which looks for resales in the United States, the agencies "look at whether the applicant reasonably expects the exported goods or services to reenter the United States for sale or consumption within the United States, and if so, whether such sale or consumption within the U.S. may have a substantial domestic impact in the relevant product markets." *See id.* at 1792.

In cases involving an application for "joint export activity among [domestic] competitors," the agencies apply a two-part test to determine "whether the conduct is likely to have a substantial anticompetitive effect in a U.S. market."[6] *See id.* at 1794. First, the agencies analyze "whether the joint activity is likely to have any anticompetitive effect on U.S. commerce." *Id.* Conduct that is free of such effects is certified. *Id.* Second, if "there is potential for anticompetitive spillover affecting U.S. markets,"[7] the agencies determine "whether the formation or contemplated operation of the joint entity is likely to substantially restrain or lessen competition within U.S. commerce." *Id.* This determination is similar to the Justice Department's antitrust scrutiny of proposed joint ventures and mergers. *Id.* Thus, "the agencies will evaluate the economic characteristics of the domestic market in order to assess whether a market is likely to be conducive to domestic price or output coordination." *Id.*

Evaluation of the domestic market structure involves several steps. First, the relevant product and geographic market is identified. Next, the structure of the relevant market is examined "in order to assess whether its economic characteristics are conducive to developing and maintaining a consensus on domestic price levels and output rates." *See id.* at 1795. To assess the market structure, the agencies

---

**5.** Purpose analysis necessarily would focus upon an applicant's avowed purposes, although it could embrace a determination of the applicant's credibility. *See supra* note 2. Such a credibility determination would rely upon inferences drawn from the likely effects of proposed conduct. Thus, the determination might be hindered by an applicant's reticence regarding possible anticompetitive effects of proposed conduct. *See id.*

**6.** It appears that Congress intended the agencies' analysis to turn upon foreseeability of anticompetitive effects. The Act's legislative history includes numerous references to the concept of foreseeability. For example, the House Judiciary Committee envisioned "a single, flexible criterion.... [R]ather than merely requiring a legal judgment as to whether the conduct would violate the antitrust laws, the standards call for a prediction of whether the conduct will be *likely* to violate the antitrust laws." *See* H.R. Rep. No. 637 (II), 97th Cong., 2d Sess. 15, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2444, 2452. (emphasis in original). The report of The House Committee on Foreign Affairs noted:

The Committee expects the Secretary of Commerce ... and the Attorney General ... to

examine carefully the possibility of any damage ocurring to any other firms or entity in U.S. domestic commerce, and to deny such certification where any such damage is reasonably foreseeable....

H.R.Rep. No. 637(I), 97th Cong., 2d Sess. 15, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2431, 2437.

It is also of note that the Act's provision of exemption of export conduct from the Sherman and Federal Trade Commission Acts utilizes a " 'direct, substantial, and reasonably foreseeable effect' test" to identify eligibility for the exemption. *See* H.R.Rep. No. 686, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2487, 2487–88.

**7.** "Spillover" effects are anticompetitive effects felt in the domestic price market caused by activities involved in joint exporting. *See* Comment, *Limiting Spillover and Foreclosure Through Title III of the Export Trading Company Act of 1982,* 52 Fordham L.Rev. 1300, 1309–10 (1984). "Foreclosure" effects are the results of anticompetitive activities which reduce or eliminate competitors' opportunities. *See id.* at 1321.

begin with a "threshold test." This test treats the joint entity as a horizontal merger. It therefore assumes that the members of the entity merged. It then examines the post-merger market concentration, which is "a function of the number of firms in a market and their respective market shares,"[8] *id.* The agencies believe that the threshold test sufficiently determines whether or not the joint venture poses a substantial threat to domestic competition in cases involving "joint ventures with small market shares in markets with a low degree of market concentration." *Id.* In other cases, the agencies will go on to examine other economic characteristics of the relevant market.[9]

*Certification of Chlor/Alkali Producers International*

Chlor/Alkali sought a certificate of review for activities related to the export of caustic soda and chlorine. Caustic soda and chlorine belong to a chemical family known as chlor-alkalis. Manufacturers of these products therefore are known collectively as the chlor-alkali industry. Caustic soda and chlorine generally are produced simultaneously through the electrolysis of salt. This process yields 1.1 tons of caustic soda for every ton of chlorine. Thus, amounts of chlorine and caustic soda are measured in electrochemical units ("ECUs"), with one ton of chlorine and 1.1 tons of caustic soda comprising one ECU. *See* A.R. at 428.[10] Chlorine is used in the manufacture of chemicals, pulp and paper, and polyvinyl chloride. It is also used in water treatment processes. Caustic soda is used in the production of chemicals, textiles, and pulp and paper. A.R. at 515–19, 561. The products ordinarily are purchased by manufacturers for use as intermediate or raw materials.

Chlorine cannot be stored or transported easily because it is expensive to liquify and maintain under pressure, and is highly toxic and corrosive. A.R. at 514. This fact, together with the fact that the two products are co-produced and are used for end products with different demand cycles,

---

**8.** The threshold test draws upon the Department of Justice's merger guidelines. An important tool utilized by those guidelines is the Herfindahl-Hirschman Index ("HHI"), *see* Merger Guidelines, 49 Fed.Reg. 26823, 26830–31 (1984). The HHI is calculated by squaring the market share of each firm competing in a market and then summing the resulting numbers. This calculation takes into account both the relative size and the distribution of firms in a market; it therefore yields a figure that expresses market concentration. Comparison of "pre-merger" and "post-merger" HHI figures measures any increase in concentration caused by the merger. *See id.*

The Department of Justice assesses the likely anticompetitive effects of mergers by reference to a scale of HHI figures that reflects different degrees of anticompetitive potential. The Department's standards for horizontal mergers are:

(a) Post-Merger HHI Below 1000. Markets in this region generally would be considered to be unconcentrated....

(b) Post-Merger HHI Between 1000 and 1800.... [T]his region extends from the point at which the competitive concerns associated with concentration are raised to the point at which they become quite serious.... The Department ... is unlikely to challenge a merger producing an increase in the HHI of less than 100 points. The Department is *likely* to challenge mergers in this region that produce an increase in the HHI of more than 100 points....

(c) Post-Merger HHI Above 1800. Markets in this region generally are considered to be highly concentrated.... The Department is unlikely, however, to challenge mergers producing an increase in the HHI of less than 50 points. The Department is likely to challenge mergers in this region that produce an increase in the HHI of more than 50 points....

*See id.* at 26831.

**9.** Such additional economic characteristics include:

(1) the ease of entry into the market by other firms,

(2) the ease with which firms in an industry can expand supply;

(3) the homogeneity of a product across producers;

(4) the existence of large buyers;

(5) whether the participants have in the past effectively coordinated domestic price levels or output rates; and

(6) whether domestic demand is stable or variable.

*See* Revised Guidelines, 50 Fed.Reg. 1786, 1795 (1985).

**10.** References to the administrative record will be indicated by the initials "A.R." and will note the specific pages to which I refer.

means that production is keyed to chlorine demand. A.R. at 429, 514. Thus, when chlorine demand is high, plants produce enough chlorine to meet the demand. If caustic soda demand is not similarly high, an oversupply of caustic soda results. Unlike chlorine, however, caustic soda can be stored until its demand strengthens. A.R. at 429. This relationship leads to large swings in caustic soda prices whenever chlorine and caustic soda production are at odds with caustic soda demand. A.R. at 514.[11]

Approximately thirty firms manufacture chlorine and caustic soda from salt. A.R. at 428. In 1983, industry sales of caustic soda, both export and import, totalled $1,690 million. Exports comprised nine percent, or $144 million of that total. In the same year, industry sales of chlorine totalled $1,009 million. Exports comprised one percent, or $12 million, of that total. A.R. at 431.

Chlor/Alkali Producers International is a joint venture formed solely to facilitate its members' exports of caustic soda, chlorine, and related products. A.R. at 10. The members plan to use the entity as a clearinghouse for export sales and marketing information, and as the exclusive sales agent for dedicated quantities of caustic soda, chlorine, and related products, to be sold exclusively in export markets. A.R. at 10. The entity will be managed by a board composed of representatives from each coventurer. A.R. at 415.

Chlor/Alkali is composed of four companies. They are B.F. Goodrich Company, Kaiser Aluminum and Chemical Corporation, Occidental Chemical Corporation, and Vulcan Materials Company. A.R. at 8. Each of these companies is a major petrochemicals producer. A.R. at 415. B.F. Goodrich Company manufactures chemical and plastic products. It is also the world's largest producer of polyvinyl chloride,

which is a chlorine-related product. A.R. at 415. In 1983, B.F. Goodrich had net sales of $3,191.7 million dollars. The company's chemical division generated $1,133.1 million of these sales. *Id.* Kaiser Aluminum and Chemical Corporation has divisions in aluminum, industrial chemicals, international trading, real estate, agricultural chemicals, and refractories. In 1983, Kaiser's net sales totalled $2,857.6 million. Industrial chemicals sales accounted for $323,600.00 of that total. *Id.* Occidental Chemical Corporation is a subsidiary of Occidental Petroleum Corporation. The parent company is involved in oil, gas, coal, agribusiness, and chemicals. A.R. at 416. Occidental Chemical's products include caustic soda, chlorine, sodium chlorate, and sodium phosphate. Occidental Chemical is the fourth largest producer of caustic soda and chlorine; it is also a larger producer of polyvinyl chloride. In 1983, its sales totaled $1.1 billion. *Id.* Vulcan Materials Company produces various industrial chemicals, including chlorinated solvents, as well as construction aggregates, secondary aluminum, detinned steel scrap, and tin chemicals. It is also involved in domestic oil and gas exploration and production. *Id.* In 1983, Vulcan's net sales were $820,519,000. *Id.* Although Vulcan is the smallest of the coventurers, its chemicals division is one of the world's major producers of chlorinated solvents, and it is a substantial producer of caustic soda and chlorine. A.R. at 125. The division's 1983 sales totaled $255.7 million. *Id.* All four of the coventurers have major caustic/chlorine plants in the Gulf region; Goodrich, Vulcan and Occidental also have plants elsewhere in the south. Occidental has an additional plant in Washington state. A.R. at 431.

The joint venture submitted its application for an export trade certificate of review on October 30, 1984; the application was officially deemed submitted on Novem-

---

**11.** It has been noted that a balance between chlorine and caustic soda can be struck. Caustic soda production can be altered by raising or lowering chlorine demand and production; this can be accomplished to some extent by raising or lowering the price of chlorine. Otherwise, the price of caustic soda can be directly modified. A.R. at 515. Therefore, pricing can play an important role in the industry. It should be noted, however, that soda ash is to some degree a substitute for caustic soda. A.R. at 428–29.

ber 1, 1984. *See* Notice of Chlor/Alkali's Certification, 50 Fed.Reg. 4251 (1985). Chlor/Alkali's proposed export activities included agreements by members to dedicate quantities of caustic soda and chlorine to the joint venture, and use of the venture as the exclusive sales agent for the quantities dedicated. The entity also planned to establish prices, quantities to be sold, allocate markets, and to refuse to quote prices or to market or sell to foreign competitors, with respect to export markets. A.R. at 22–23. The entity also sought to certify discussions and exchanges of information among the coventurers regarding export-related topics. A.R. at 23–24. At one point, the ability to make purchases from non-members was also desired, A.R. at 313, but this proposal was rejected by the agencies, *see id.; see also* A.R. at 565–66 (certified export trade activities). Finally, Chlor/Alkali also requested certification of its proposed restrictions on the withdrawal and addition of coventurers. A.R. at 24.

Chlor/Alkali requested expedited review because it wanted to bid on multi-year contracts for supply of caustic soda and chlorine in Australia. Chlor/Alkali stated that these contracts are customarily negotiated and consummated between September and the end of December or early January. A.R. at 1. Chlor/Alkali also noted, in discussions with the Justice Department, that

it desired expedited review because Saudi Arabian facilities for the production of caustic soda and chlorine would be completed by March or April of 1985, and the Saudis were likely to sell on world markets. A.R. at 347.[12]

The Commerce Department approved the request for expedited review and sought the concurrence of the Justice Department. A.R. at 417. The Justice Department was willing to grant expedited review of export activities that would occur before March 1, 1985; however, the Justice Department subsequently determined that review could not be completed in the time allotted for expedited review. On November 28, 1984, Chlor/Alkali was informed of this situation; at the agencies' behest, it withdrew its request for expedited review. *Id.* Therefore, the agencies' review of Chlor/Alkali's application therefore was to be completed by January 30, 1985. *Id.*

During the review period, the agencies analyzed materials submitted by Chlor/Alkali, interviewed other members of the industry, and performed an economic analysis of the probable domestic effects of Chlor/Alkali's proposed export activities. *See* A.R. at 302–560. The agencies' review culminated with the issuance of a certificate of review on January 25, 1985. A.R. at 563.[13]

---

**12.** Plaintiffs dispute the contention that expedited review was necessitated by the schedule for negotiation of Australian contracts or the threat of Saudi production. According to plaintiffs, Australian contracts are negotiated throughout the year, and the Saudi Arabian plant was not completed by March or April of 1985. *See* Mercer Affidavit at para. 15.

**13.** Chlor/Alkali's application was deemed submitted on November 1, 1984. Notice of Chlor/Alkali's application was published in the Federal Register on November 15, 1984, at 49 Fed.Reg. 45203 (1984). *See* A.R. at 574. The notice indicated that comments on the application were to be submitted by December 3, 1984. *Id.* Because the notice appeared before expedited review was withdrawn, it also indicated that Chlor/Alkali's request for expedited review had been granted and that interested parties' comments on the application would be due twenty days after the publication of the Federal Register notice. A.R. at 575.

Plaintiffs complain that the agencies' provision of notice was faulty in several respects. First, they object to the timing of the publication on the ground that the Act calls for publication within ten days. *See* 15 U.S.C.A. § 4012(b)(1) (West Supp.1985). Second, they complain that the twenty day comment period provided by the agencies was "substantially" shorter than "the comment period that would have been provided under the normal ninety day application process."

The agencies take issue with the plaintiffs' characterization of the notice and comment procedures. With respect to publication, the defendants point out that the notice was submitted to the Federal Register for publication on November 9, 1984. Because the Secretary cannot control the Federal Register's publication schedule but can control submission dates, defendants conclude that submission on November 9 and subsequent publication on November 15 complies with the Act's requirements. As for the comment period, defendants contend that

*The Challenge To Chlor/Alkali's Certification*

The plaintiffs in this case are Horizons International, Incorporated ("Horizons"), and Kenchem, Incorporated ("Kenchem"). Horizons is a California corporation with its principal place of business in California. For the past ten years, Horizons has engaged in the business of trading—that is, purchasing, marketing, and reselling—caustic soda, chlorine, and chlorine derivatives. Horizons' business includes sales activities throughout the United States as well as sales for export. Horizons' yearly sales have never exceeded $20 million. *See* Mercer Affidavit at para. 1. Kenchem is a Pennsylvania corporation with its principal place of business in Pennsylvania. For at least the last four years, Kenchem has provided marketing and consulting services to traders of caustic soda, chlorine, and chlorine derivatives. Horizons is among Kenchem's clients. Kenchem's annual revenues are less than Horizon's. *See* Hutton Affidavit at para. 1.

Plaintiffs filed their complaint on February 22, 1985. They contend that Chlor/Alkali does not meet the Export Trading Company Act's certification standards because its members are involved in an anticompetitive conspiracy with respect to the manufacture and marketing of caustic soda, chlorine, and chlorine derivatives. The plaintiffs allege that Chlor/Alkali's members have boycotted traders, including plaintiffs, have fixed and stablized prices for chlorine, caustic soda, and chlorine derivatives, have allocated customers and geographic markets for caustic soda, chlorine, and chlorine derivatives, and have made agreements to limit output and supplies of caustic soda, chlorine, and chlorine derivatives. Plaintiffs allege that this conduct is ongoing.

Plaintiffs also allege that Chlor/Alkali's members have engaged in a number of other anticompetitive activities in order to facilitate the overall anticompetitive scheme. These alleged activities include filing lawsuits against plaintiffs for purposes of "punishing the plaintiffs, ... depleting the plaintiffs' resources, and forcing the plaintiffs out of business," as well as various arrangements facilitating the fixing and stabilizing of prices and the allocation of markets and customers. Plaintiffs allege that many of these anticompetitive activities are directed towards traders, such as plaintiffs. Plaintiffs contend that this is because traders are viewed as procompetitive and disruptive to the marketplace. Thus, plaintiffs contend, members of the industry have collectively agreed to boycott traders unless the traders can be compelled to conform to anticompetitive arrangements.

Plaintiffs urge that they are aggrieved by defendants' issuance of Chlor/Alkali's certificate of review because the certificate will facilitate the above-described anticompetitive practices. Plaintiffs fear that this will result in particular harm to traders, including plaintiffs. Plaintiffs also complain that certification of Chlor/Alkali has created a "powerful new entrant" in the business of exporting caustic soda, chlorine, and chlorine derivatives. They fear that this new entrant will have the power to exclude competitors, including plaintiffs.

Defendants have now filed two motions. Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, they have filed a Motion to Dismiss the case against the United States Attorney General and the

the twenty day period is the rule for all applications, pursuant to regulations promulgated under the Act. *See* 15 C.F.R. 325.5(b) (1985); *see also* Interim Regulations, 48 Fed.Reg. 10602 (1983).

Defendants are correct that the regulations provide for a twenty day comment period. Moreover, the actual comment period given by the agencies was November 15 through December 3, or eighteen days. The proximity of that period to the twenty days provided by the stat-

ute, together with the fact that neither plaintiffs nor anyone else submitted comments to the agencies, tends to reduce the significance of plaintiffs' objections.

These observations do not affect the merits of this case, because plaintiffs' failure or inability to comment does not affect their standing to bring this suit. The Act provides that *"any* party" aggrieved by certification procedures may bring an action to set aside the determination. *See* 15 U.S.C.A. § 4015(a) (emphasis added).

United States Department of Justice for lack of subject matter jurisdiction. They have also filed a Motion for Summary Judgment. Both motions are denied.

*The Motion To Dismiss*

The defendants' Motion to Dismiss is premised upon their reading of section 305(b) of the Export Trading Company Act, which is codified at 15 U.S.C.A. section 4015(b) (West Supp.1985). According to defendants, that section of the Act precludes judicial review of the Attorney General's concurrences in the Secretary's certification determinations. Thus, the defendants argue, the Act expressly limits this court's subject matter jurisdiction to the actions of the Secretary of Commerce.

The pertinent provisions of the Act provide:

(a) If the Secretary grants or denies ... an application for a certificate of review ... any person aggrieved by such determination may, within 30 days of the determination, bring an action ... to set aside the determination on the ground that such determination is erroneous.

(b) Except as provided in subsection (a) of this section, no action by the Secretary or the Attorney General shall be subject to judicial review.

15 U.S.C.A. § 4015(a)–(b). Defendants contend that subsection (b) limits judicial review to the scope of subsection (a). They contend that subsection (a) confers jurisdiction to review only the Secretary's determination. Defendants therefore conclude that the Attorney General's concurrence cannot be reviewed.

Plaintiffs contend that the Attorney General and the Justice Department are proper parties to this action. Their argument is premised upon their analysis of the roles played by the Secretary and the Attorney General in the certification process. Plaintiffs point out that the Secretary must have the Attorney General's concurrence before a certificate can be issued. They also point to the Act's legislative history, which includes the statement that "[t]he Secretary shall not issue the certificate without the concurrence of the Attorney General that

the Standards of Section 303 are met." *See* H.R.Rep. No. 924, 97th Cong., 2d Sess. 26, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2501, 2510. Plaintiffs further note that the Attorney General must also concur in the Secretary's response to any request for reconsideration of a denial of certification. *See* 15 U.S.C.A. § 4013(d)(2). Finally, plaintiffs note that the Attorney General has authority to investigate possible noncompliance with certification standards in connection with revocation or modification of a certificate; moreover, the Attorney General has authority to require revocation or modification of a certificate. *See* 15 U.S.C.A. § 4014; *see also* H.R.Rep. No. 924, 97th Cong., 2d Sess. 27, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2501, 2511. Thus, the plaintiffs argue, the Secretary cannot make unilateral certification decisions. Plaintiffs therefore conclude that the Attorney General and the Justice Department are necessary parties to this action.

Plaintiffs also disagree with defendants' reading of the Act's provisions for judicial review. Like defendants, they read section 4015(b) to mean that judicial review is limited to the actions described in section 4015(a); however, they read section 4015(a) to include the actions of the Secretary *and* the Attorney General. According to plaintiffs, the limitations in section 4015(a) do not confine *whose* actions may be reviewed; rather, the limitations are on *what* actions may be reviewed. That is, they believe that review is confined to the grant, denial, revocation, or modification of a certificate.

The Motion to Dismiss therefore presents a problem of statutory construction. The statute clearly provides for judicial review of the grant, denial, revocation, or modification of a certificate. *See* 15 U.S.C.A. § 4015(a). What is not clear is whether this review may extend to the Attorney General as well as the Secretary. The ambiguity results from subsection (a)'s explicit reference to the Secretary and simultaneous omission of the Attorney General, coupled with subsection (b)'s limi-

tation of review to the terms of subsection (a).

I conclude that it would be illogical for the Act to provide for review of certification but to limit such review to the Secretary's actions. As plaintiffs have pointed out, the Attorney General and the Justice Department are integral to the certification process. Their role precludes unilateral certification by the Secretary. Moreover, the statute provides that the Attorney General can specify the terms and conditions of certification; thus, the Attorney General can control independently the conduct to be certified. *See* 15 U.S.C.A. § 4013(b)(3). Finally, the Attorney General is entitled to a copy of the application and materials relevant to certification; this information enables the Attorney General to be more than a rubber stamp for the Secretary's determination. In sum, the Attorney General is involved in both procedural and substantive aspects of the certification process.

Therefore, I conclude that the Act permits judicial review of the actions of the Attorney General and the Justice Department. The roles of the Attorney General and the Justice Department in the certification process makes them necessary parties to this action. Otherwise, the Act's provision of judicial review for parties aggrieved by certification decisions would be meaningless.

My conclusion is supported by the "strong presumption that agency action is reviewable." *Kirby v. United States Government, Department of Housing and Urban Development,* 675 F.2d 60, 67 (3d Cir.1982). " 'Only upon a showing of "clear and convincing evidence" of a contrary legislative intent should the courts restrict access to judicial review.' " *Id.* (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). Thus, restriction of judicial review is only appropriate when the agencies are vested with extremely broad discretion; agency action is unreviewable only in " 'those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply." ' " *Id.* (quoting *Citizens of Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971)). The Export Trading Company Act does not grant the Attorney General such broad discretion. Moreover, there is no clear and convincing evidence of a legislative intent to insulate the Attorney General and the Justice Department from review.[14]

Relying upon *Heckler v. Chaney,* —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), defendants note that enforcement agency actions are generally unsuited for judicial review. Defendants submit that the role of the Attorney General and Justice Department in the certification process is that of an enforcement agency. Therefore, they conclude that there should not be judicial review of the actions of the Attorney General and the Justice Department. *Heckler v. Chaney* is inapposite. Its conclusion regarding the general unsuitability for review of enforcement agency actions pertained to allocations of prosecutorial resources, which are "generally committed to an agency's absolute discretion." *Id.* —— U.S. at ——, 105 S.Ct. at 1656. This case involves a much different kind of decision.

---

**14.** Defendants argue that the bill originally passed by the House demonstrates a legislative intent to insulate the Attorney General's actions from review. That bill placed certification entirely in the hands of the Attorney General and precluded review of the Attorney General's determinations regarding issuance, amendment, or revocation of a certificate. *See* H.R.Rep. No. 637 (II), 97th Cong., 2d Sess. 21, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2444, 2458.

This argument is not persuasive. The House version entirely precluded judicial review of grants or denials of certification, while the final statute does not. Such a significant difference negates the inference that any part of the House's intentions with respect to review remains viable. Moreover, the basis of the House bill was not a desire to protect the Attorney General from review; rather, it was "to protect the certificate holder's interest and promote imports." *See id.* Such protection obviously depends upon preclusion of *all* review. The final statute does not preclude all review. Thus, the original House bill does not support preclusion of judicial review of the Attorney General's actions under the final statute.

*The Motion for Summary Judgment*

Defendants have also filed a Motion for Summary Judgment. They argue that there are no genuine issues of material fact and that they are entitled to summary judgment as a matter of law.

As the moving parties, the defendants have the burden of demonstrating the absence of any genuine issues of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.15[3] (2d ed. 1985). In order to grant a motion for summary judgment, it must also appear that there is no real question regarding the credibility of the evidentiary material, so that it may be taken a true. 6 *Moore's Federal Practice, supra*, at ¶ 56.-15[3]. In considering a motion for summary judgment, the evidence and papers must be viewed in the light most favorable to the opposing party. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608; 6 *Moore's Federal Practice, supra*, at ¶ 56.15[3].

In response to defendants' Motion for Summary Judgment, plaintiffs raise a host of issues regarding Chlor/Alkali's certification. These issues all relate to their overall contention that the issuance of the certificate in this case was improper. This broad argument has two major components. First, plaintiffs contend that the Export Trading Company Act was not meant to benefit a joint venture like Chlor/Alkali, which is composed of four large corporations. Second, plaintiffs contend that Chlor/Alkali does not meet the Act's certification standards. Thus, plaintiffs argue, Chlor/Alkali should not have been granted a certificate.

Turning to plaintiffs' first contention, it is apparent that certification of Chlor/Alkali "extended antitrust protection to four major U.S. producers of chlorine and caustic soda." *See* A.R. at 561. Chlor/Alkali's certification was viewed by the Commerce Department as "especially important because it is a significant use of the ... Act by major, well-known U.S. companies." *See id.*

Portions of the Export Trading Company Act's legislative history support plaintiffs' contention that the legislators intended to benefit small and medium-sized companies. *See, e.g.,* H.R.Rep. No. 637 (II), 97th Cong., 2d Sess. 7, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2444, 2444 (Act is intended to encourage joint export activity among small and medium-sized businesses); H.R. Rep. No. 629, 97th Cong., 2d Sess. 8, *reprinted in* 1982 U.S.Code Cong. & Ad. News 2467, 2471 (greatest potential U.S. export capacity is with small and medium-sized firms, which face the greatest obstacles to exporting). Secretary of Commerce Malcolm Baldridge told the House Foreign Affairs Committee that "[t]he need for export trading companies is said to arise from the fact that small- and medium-sized American firms may not have necessary export skills and may not be large enough to achieve economies of scale in export." *See* H.R.Rep. No. 637(II), 97th Cong., 2d Sess. 10, *reprinted in* 1982 U.S. Code Cong. & Ad.News 2444, 2447. Baldridge went on, "[t]oo large a share of U.S. exports come[s] from large firms. We need a mechanism to stimulate and train these smaller firms in this skill...." *Id.* The Act itself states that "tens of thousands of small- and medium-sized United States businesses produce exportable goods or services but do not engage in exporting." 15 U.S.C.A. § 4001(a)(4) (statement of findings and declaration of purposes).

■ Although these statements suggest a legislative intent to promote exporting activities by small- and medium-sized firms, the actual terms of the Act are not limited to such entities. The Act provides that certificates may be issued to "any applicant" that meets the Act's certification standards. 15 U.S.C.A. § 4013(a). An application may be submitted by "a person," 15 U.S.C.A. § 4012(a), and the Act permits the Secretary to issue certificates to "any person." 15 U.S.C.A. § 4011. The Act defines "person" as "an individual ...; a partnership ...; a state or local government entity; a corporation ... or any asso-

ciation or combination, by contract or other arrangement, between or among such persons...." 15 U.S.C.A. § 4021(5). The agencies interpret this definition to mean that "any individual or legal entity that is a resident or citizen of the United States can apply for a certificate...." *See* 50 Fed. Reg., *supra*, at 1789.

Finally, the Act's legislative history also demonstrates that Congress did not intend to restrict it to small and medium-sized entities. The Act was intended to cover entities operating under the Webb-Pomerene Act,[15] *see* H.R.Rep. No. 637 (I), 97th Cong., 2d Sess. 18–19, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2431, 2440–41. Webb-Pomerene organizations include large companies. Thus, while it appears that Congress might not have specifically envisioned large entities as beneficiaries of the Act, it also appears that Congress did not intend to exclude them from the Act. The only limitations Congress placed upon eligibility for certification are the Act's four certification standards. Thus, Chlor/Alkali was eligible for certification and this court must measure the propriety of its certification against those standards.

■■■ Before considering the merits of the agencies' actions, it is necessary to set forth the applicable standards and scope of review. The actions of administrative agencies are afforded a presumption of regularity. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). An agency's action may be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 41, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983). Under this standard, an agency action will be upheld if it is rational, based upon a consideration of the relevant factors, and within the

scope of the agency's statutory authority. *Id.* at 42–43, 103 S.Ct. at 2866. This means that the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43, 103 S.Ct. at 2866–67 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). Judicial review of the agency's explanation must "'consider whether the decision was based upon a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* 463 U.S. at 43, 103 S.Ct. at 2867 (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) and *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. at 823)).

■■ The scope of judicial review under this standard is narrow. A court may not substitute its judgment for that of an agency. *Motor Vehicle Manufacturers Association*, 463 U.S. at 43, 103 S.Ct. at 2866. Moreover, courts generally may not conduct a *de novo* review of the agency's decision, *see Camp v. Pitts*, 411 U.S. 138, 140–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973) (per curiam); *see also Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415, 91 S.Ct. at 823. *De novo* review is authorized only in cases in which "the [agency] action is adjudicatory in nature and the agency factfinding procedures are inadequate"; there may be independent judicial factfinding "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415, 91 S.Ct. at 823. *Camp v. Pitts* therefore instructs that "the focal point for judicial review should be the administrative record already in existence,

---

**15.** The Webb-Pomerene Export Trade Act, codified in its present form at 15 U.S.C. §§ 61–66 (1982), permits United States exporters to join together to engage in export trade activity free of the Sherman Act, provided that they comply with the Webb-Pomerene Act's provisions. Per-

ceived inadequacies in the Webb-Pomerene Act were an impetus to the Export Trading Company Act. *See generally*, H.R.Rep. No. 637 (I), 97th Cong., 2d Sess. 1–16, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2431, 2431–39.

not some new record made initally in the reviewing court." *See Camp,* 411 U.S. at 142, 93 S.Ct. at 1244.

Plaintiffs nonetheless urge that review in this case is *not* limited to the administrative record. The heart of plaintiffs' argument is their contention that Congress intended to exempt proceedings before the Secretary of Commerce from the Administrative Procedure Act. From this premise, they conclude that the Administrative Procedure Act's restrictions upon the scope of judicial review are inapplicable to review of the agencies' actions under the Export Trading Company Act.

Plaintiffs base this argument upon the Export Trading Company Act's legislative history. Specifically, plaintiffs rely upon the following discussion:

Section 305(a) provides that a review of a grant ... of an application for a certificate ... of any person aggrieved by such determination if such suit is brought within 30 days of the determination. *Normally, the administrative record shall be adequate so that it will not be necessary to supplement it with additional evidence.*

The Senate bill required, prior to revocation or modification of a certificate, a hearing as appropriate under the circumstances. The House bill did not require a hearing. In following the House approach, the Conferees understood that, should the Secretary nevertheless establish a hearing procedure, ... [the Act] would not require use of the procedures of the Administrative Procedure Act.

H.R.Rep. No. 924, 97th Cong., 2d Sess. 27, *reprinted in* 1982 U.S.Code Cong. & Ad. News 2501, 2511 (emphasis added).

The second paragraph of the discussion is suggestive, but it offers only limited guidance. While it is clear that Congress did not intend to apply APA procedures to hearings before the Secretary, it is something of a leap to assume that Congress had the same intentions with respect to judicial review. Review by the Secretary would be an internal procedure free of the deference considerations called into play by

judicial review of agency actions. Thus, while Congress envisioned additional fact-gathering in the context of agency reconsideration of a certification decision, it does not necessarily follow that Congress envisioned additional fact-gathering in the context of judicial review. This is especially true given the principles of judicial review established in *Citizens of Overton Park, Inc.* and *Camp v. Pitts.*

■ Nonetheless, the first paragraph strongly suggests that Congress *did* envision additional fact-finding in the context of judicial review of agency certification decisions in at least some cases. The statement that "[n]ormally, the administrative record shall be adequate so that it will be unnecessary to supplement it with additional evidence" seems clearly to mean that the administrative record may sometimes require supplementation with additional evidence.

■ I find that this case is inappropriate for *de novo* review. Nonetheless, the case is an instance in which supplementation of the administrative record is required. The plaintiffs have submitted evidence to support their contention that Chlor/Alkali cannot meet the Export Trading Company Act's certification standards. This evidence includes "relevant data" necessary to the determination of Chlor/Alkali's eligibility for certification. Without this data, the agencies will have "failed to consider ... important aspect[s] of the problem...." *See Motor Vehicle Manufacturers Association,* 463 U.S. at 43, 103 S.Ct. at 2867. Absent consideration of this additional evidence pertaining to the issues identified in my order, issuance of an export trade certificate to Chlor/Alkali would be arbitrary, capricious, and an abuse of discretion. Due to the time constraints imposed by the short comment and decision periods under which they operated, it is understandable that the agencies would not previously have had the opportunity to consider these matters. Failure to consider them now, however, would be erroneous; that is, it would be arbitrary, capricious, and an abuse of discretion.

Plaintiffs' evidence primarily consists of affidavits and discovery materials[16] tending to establish the existence of a price-fixing conspiracy and other anticompetitive practices in the chlor-alkali industry. The evidence suggests that members of Chlor/Alkali are participants in this conduct. Plaintiffs also proffer an economist's critique of the agencies' economic analysis of the potential domestic effects of Chlor/Alkali's activities, as well as materials pertaining to a Federal Trade Commission proceeding against B.F. Goodrich. Plaintiffs also ask me to take judicial notice of reported antitrust decisions against members of the chlor-alkali industry.

 Plaintiffs' affidavits and discovery materials raise a number of questions regarding the likely anticompetitive purposes and effects of Chlor/Alkali's certification. These questions pose genuine issues of material fact regarding Chlor/Alkali's eligibility for certification. The existence of these issues therefore means that defendants' Motion for Summary Judgment must be denied. Their existence also leads me to remand this matter to the agencies for their reasoned analysis of the issues and the additional relevant data discussed in this opinion.

A number of plaintiffs' materials supply evidence of price-fixing activities in the chlor-alkali industry. The deposition of Larry Edwards, former Marketing Manager of Stauffer Chemical Company's chlor/alkali division, reveals that industry competitors often participated in conversations that may well have had price-fixing purposes and effects. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Memorandum") at 62–69 (quoting portions of Mr. Edwards' deposition). Edwards' deposition also yields evidence that members of the industry tend to avoid selling to brokers because of the brokers' practice of price-cutting upon resale. This tendency to avoid brokers may extend to an actual boycott of brokers, including plaintiff Horizons. *See id.* at 70; *see also* Mercer Affidavit; Hutton Affidavit. While Mr. Edwards did not name members of Chlor/Alkali as participants in these anticompetitive activities, *see* Plaintiffs' Memorandum at 62–72, his deposition provides evidence that anticompetitive practices may be widespread in the chlor-alkali industry.[17]

Evidence of price-fixing practices is also supplied by the deposition testimony of Andrew Cochrane, a marketing executive for Olin Corporation. Cochrane testified that he engaged in "extensive and continuing

16. On April 24, 1985, I issued an order denying defendants' motion for a protective order and permitting the plaintiffs to engage in discovery. My order held:
 1. The Court should not determine whether the Secretary's determination was 'erroneous' regarding the requirements of Section 4013(a)(1)(2)(3) without seeing the results of the discovery.
 2. The discovery is necessary to determine how to apply Congress' intent that "normally" the administrative record alone is adequate for purposes of judicial review, i.e., whether, in light of the facts sought in discovery, this is an exceptional case requiring that the administrative record be supplemented with additional evidence.
 3. Balancing the burdens of the discovery, the need for prompt, meaningful and efficient judicial review and recognizing the possibility that the discovery may indeed be wasted motion in the end, the Court concludes that the more efficient way to proceed is to conclude discovery within sixty days and then litigate the legal issues with the appropriate factual

base (be it the administrative record alone or as supplemented) rather than argue legal issues in the abstract on an administrative record which one side contends is incomplete.
 4. The need for certainty that judicial review has been upon a complete record outweighs the short run efficiencies of shutting-off discovery at the start of the case.

17. Mr. Edwards also stated that he has developed close personal relationships with competitors' marketing personnel, and that he had "continuing communications and contacts with his competitors throughout at least the last ten years, including representatives of Goodrich and Occidental." *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion For Summary Judgment at 70. In contrast to Edwards' description of price-related communications, the existence of such relationships and communications does not in itself suggest that Edwards and others engaged in price-fixing activities. It does provide circumstantial evidence regarding the likelihood of such activities, however.

discussions and communications with competitors." Cochrane contended that these communications were not related to pricing, *id.* at 71–72. Plaintiffs contradict this contention. They allege that in 1981 Mr. Cochrane testified, in another litigation, that he had engaged in pricing discussions with competitors. *See* Mercer Affidavit; *see also* Plaintiffs' Exhibits 8 & 9.

The deposition of Manuel Llama, President of Malaco International, Inc., a California trading company, supplies further evidence of price-fixing. Llama testified that he and Richard Damberg, Marketing Manager for Kaiser's chlor-alkali products, engaged in pricing conversations in order to arrange bids with Proctor and Gamble.[18] *See* Plaintiffs' Memorandum at 75–76; *see also* Mercer Affidavit; Plaintiffs' Exhibits 12 & 13.

Further evidence of anticompetitive activities is provided by the deposition of James Bryan, General Manager for Old World Trading Company, a Chicago area chlor/alkali trader. Mr. Bryan stated that he was advised by Stauffer Chemical Company employees to increase his prices if he wished to continue business with Stauffer. *See* Plaintiffs' Memorandum at 76–77; *see also* Mercer Affidavit; Plaintiffs' Exhibit 4.

Finally, the affidavit of Kenneth Hutton, along with its exhibits, also bears upon the possible existence of price-fixing activities. Mr. Hutton is the President of plaintiff Kenchem, Inc.; he was formerly employed by ICI Americas Inc. Mr. Hutton states that ICI and B.F. Goodrich have made arrangements for the sale to ICI from B.F. Goodrich of caustic soda for export to Australia. Plaintiffs contend that these arrangements have the effect of fixing and stabilizing caustic soda prices, and of dividing world markets for caustic soda. *See* Plaintiffs' Memorandum at 78–79; *see also* Hutton Affidavit. Hutton also recounts a price-related telephone conversation with an individual involved in marketing PPG Industries' chlor-alkali products. The conversation pertained to a price increase

agreement between PPG, Olin, and Diamond Shamrock. *See* Hutton Affidavit. Hutton also describes ICI's "technical liasion" meetings with competitors, including Goodrich, to discuss commercial information. *Id.* Finally, Hutton states that ICI did not sell to traders, who are known for price-cutting, because it feared retaliation from its competitors. *Id.*

This evidence requires serious evaluation by the agencies, especially given the chlor-alkali industry's anticompetitive history. The plaintiffs ask that I take judicial notice of several reported antitrust cases brought by the Justice Department against major chlor-alkali companies. These cases evidence an extensive history of price fixing and market allocating activities in the chlor-alkali industry. *See, e.g., United States v. FMC Corporation,* 306 F.Supp. 1106 (E.D.Pa.1969); *United States v. Pennsalt Chemicals Corporation,* 260 F.Supp. 171 (E.D.Pa.1966); *United States v. United States Alkali Export Association,* 86 F.Supp. 59 (S.D.N.Y.1949).

This history of anticompetitive practices may be indicative of the likelihood of ongoing, or future, anticompetitive conduct in the industry. Commerce Department guidelines for the Export Trading Company Act note that past price and output coordination by members of a joint venture is relevant to the likelihood that substantial restraints on domestic competitive will result from the joint venture's certification. *See* 50 Fed.Reg., *supra,* at 1795. Similarly, the Justice Department is more likely to challenge a merger when "[f]irms in the market previously have been found to have engaged in horizontal collusion regarding price, territories, or customers, and the characteristics of the market have not changed since the most recent finding." *See* Merger Guidelines, 49 Fed.Reg. 25823, 26833 (1984). By the same token, the Department is more likely to challenge a merger "[w]hen the market in which the proposed merger would occur is currently performing noncompetitively...." *Id.*

---

**18.** At his deposition, Mr. Damberg denied that such conversations took place. Mr. Damberg's denials prompted plaintiffs to depose Mr. Llama. *See* Plaintiffs' Memorandum at 75–76.

The legislative history of the Export Trading Company Act also stresses the importance of market history as an indicator of the likelihood of anticompetitive behavior. A discussion of the certification provisions in a version of the Act which put certification decisions solely in the hands of the Justice Department emphasized that the standards "call for a prediction of whether the conduct will be *likely* to violate the antitrust laws. This determination calls upon the experience, expertise, and knowledge of the Department of Justice in analyzing the applicant's proposed conduct against the backdrop of market structure and history." *See* H.R.Rep. No. 637 (II), 97th Cong., 2d Sess. 15–16, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2444, 2452–53.

The history of the chlor-alkali industry therefore bears upon Chlor/Alkali's ability to meet the Act's certification standards. The agencies were aware of this history, because they knew of consent decrees stemming from an antitrust litigation against parties which included Hooker Chemical, a predecessor corporation of Occidental. The agencies assessed the impact of the consent decrees upon Chlor/Alkali's certification, but their assessment did not focus upon Chlor/Alkali's ability to meet the certification standards. It instead focused on the question of whether the decrees barred certification as a legal matter. The agencies never considered whether the history of the practices that led to the decrees suggest a likelihood of anticompetitive effects from Chlor/Alkali. *See* A.R. at 339–41, 392–405; *see also* A.R. at 423–24.

Records from Federal Trade Commission ("FTC") proceedings concerning B.F. Goodrich, a member of Chlor/Alkali, also are relevant to the likelihood of anticompetitive effects from Chlor/Alkali's certification.[19] Plaintiffs submitted these records as evidence for their contention that anticompetitive industry practices are ongoing and involve members of Chlor/Alkali. The records include information regarding the history and structure of the chlor-alkali industry. They also raise important questions regarding the history and structure of the chlorine-derivatives industry.

The gist of the FTC complaint is that Goodrich's acquisition of vinyl chloride monomer ("VCM") and polyvinyl chloride ("PVC") plants from Diamond Shamrock Chemicals Corporation and Diamond Shamrock Plastics Corporation violated Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act. The FTC believed that the acquisition "eliminates actual competition between two significant competitors and substantially lessens competition by significantly increasing the levels of concentration in three markets ... Vinyl chloride monomer ... bulk and suspension polyvinyl chloride ... and dispersion polyvinyl chloride...." *See* Complaint Counsel's Non-Binding Statement at 1–2, in Appendix to Plaintiffs' Memorandum in Opposition to Defendants Motion for Summary Judgment. VCM and PVC are chlorine derivatives; thus, the VCM and PVC markets are related to the chlorine and caustic soda markets. Moreover, plaintiffs assert that the primary VCM and PVC manufacturers are often major producers of chlorine and caustic soda. *See* Mercer Affidavit. For these reasons, plaintiffs contend that VCM and PVC should be considered segments of the chlor-alkali industry.

If plaintiffs are correct, and VCM and PVC are segments of the chlor-alkali industry, then the matters raised in the FTC proceedings against Goodrich may well affect Chlor/Alkali's eligibility for export trade certification. For example, it is possible that the relevant markets should be defined to include VCM and PVC and that the agencies' HHI calculations for Chlor/Alkali therefore should be adjusted.

---

**19.** The FTC proceedings were initiated by a January 4, 1982 FTC complaint. The matter is entitled *In the Matter of the B.F. Goodrich Company, et al.,* Docket No. 9159. At a hearing before this court on the Motion to Dismiss and the Motion for Summary Judgment, counsel for the defendants noted that the case had been dismissed. Plaintiffs responded that the matter is not yet closed because the FTC staff is appealing the dismissal.

*See* 49 Fed.Reg., *supra*, at 26831–32 (merger guidelines describing market definition process). If such adjustments yield higher HHI figures, then Chlor/Alkali's eligibility for certification certainly could be affected.

This possibility is especially important in light of plaintiffs' contentions regarding the significance of the HHI calculations the agencies have already performed. Plaintiffs raise this issue primarily through submission of expert opinion evidence in the form of an affidavit by an economist. Plaintiffs' economist is a Professor at the William Mitchell College of Law in St. Paul, Minnesota, and holds a Ph.D. degree in Economics from the University of Minnesota. *See* Hamilton Affidavit at para. 2. Hamilton reviewed the administrative record, examined the discovery materials, read portions of the record in the B.F. Goodrich matter, and investigated and reviewed the chlorine and caustic soda industry. *Id.* at para. 3–4. On this basis, Hamilton concluded that Chlor/Alkali's certification will "create an anticompetitive domestic impact." *See id.* at para. 5. In particular, he disagreed with the agencies' analysis of Chlor/Alkali's HHI figures. *Id.* at para. 11–33.

All of this is not to say that the Hamilton analysis is "correct," or that it is a "better" analysis than that of the agencies. This court may not substitute its own judgment for that of the agencies. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. at 823. Nonetheless, the affidavit illustrates the existence of genuinely disputed material facts that preclude summary judgment in this case.

Hamilton believes that Chlor/Alkali's certification will result in an anticompetitive domestic impact primarily because the certificate permits the joint venturers to exchange information. This feature of the certificate gives the joint venture the effect of a merger. Moreover, the exchanges can be put to use for anticompetitive purposes

and Hamilton concluded that the structure and history of the chlor-alkali market and industry make it likely that the information will be so used. Specifically, he noted several features of the market that facilitates anticompetitive conduct; he also noted that the industry's history betrays a predisposition to engage in such conduct. *See id.* at para. 11–34. In this light, Hamilton viewed Chlor/Alkali's HHI figures as a significant indicator that its certification will have anticompetitive effects. He concluded that the figures reveal highly concentrated markets, that the Justice Department would have challenged a merger of the joint venturers, and that sharing of information in this context "has a high chance of creating anticompetitive results." *Id.* at para. 11 & 17.

Hamilton's interpretation of the economic data poses a reasoned alternative that the agencies should consider upon remand. *Cf. Motor Vehicle Manufacturer Association*, 463 U.S. at 49–51, 103 S.Ct. at 2870–71 (agency need not consider every conceivable alternative, but its failure to consider an airbags-only passive restraint system was not acceptable). Comparison of Hamilton's analysis with the agencies' analysis illuminates several matters that the agencies should consider. The essential difference between the analyses lies in their interpretations of the HHI calculations. Hamilton concluded that they signified anticompetitive consequences to certification, whereas the agencies concluded that they did not. Both analyses looked at the same numbers. Thus, the explanation for their contradictory conclusions lies in the "variety of other economic characteristics [besides HHI figures] relevant to determining whether ... the joint export entity is likely to be a substantial restraint on domestic competition," *see* 50 Fed.Reg., *supra*, at 1795; *cf.* 49 Fed.Reg., *supra*, at 26832–34.[20] These factors are critical in

---

**20.** The "other factors" listed in the Export Trading Company Act guidelines are:

(1) the ease of entry into the market by other firms,

(2) the ease with which firms in an industry can expand supply;

(3) the homogeneity of a product across producers;

(4) the existence of large buyers;

cases with relatively high HHI figures; the presence or absence of characteristics associated with these factors can determine the outcome of a case. "[E]ven in a concentrated market, the absence of [these] characteristics ... may lead to the conclusion that successful price and output coordination would be unlikely and that, therefore, certification would be possible for joint export activities with few or no limitations." *See* 50 Fed.Reg., *supra*, at 1795.

In Chlor/Alkali's case, the agencies recognized that the HHI figures showed a relatively concentrated market. Nonetheless, the agencies concluded that certification of Chlor/Alkali would be unlikely to have anticompetitive effects. This conclusion stemmed from their belief that Chlor/Alkali lacks the requisite "market power" to cause anticompetitive effects. According to the agencies, Chlor/Alkali lacks such market power because its share of the relevant market is small, the increase in concentration is not great, and the joint venture's customers are "large, sophisticated buyers." *See* A.R. at 418–19.

In contrast, Hamilton found that Chlor/Alkali's HHI figures are cause for concern. His perception was shaped by his focus upon market and industry history, the relatively inelastic demand for chlorine and caustic soda, ease of retaliation for price-cutting, barriers to entry, and similarity of production costs. *See* Hamilton Affidavit at para. 20–30, 37.

Hamilton also questioned the accuracy of the agencies' HHI calculations. Specifically, he believed that the agencies incorrectly defined the geographic markets for caustic soda and chlorine. *See* id. at para. 9, 15–18. The agencies identified the relevant geographic market as the "Gulf region," which roughly consists of Texas, Louisiana, and Southern Alabama. *See* A.R. at 426, 431–33.[21] The Gulf region was selected as the relevant market because it is the only region where all of Chlor/Alkali's members have plants. *See* *id.* at 426. Hamilton believed that the relevant geographic market is nationwide. *See* Hamilton Affidavit at para. 16–17. In Hamilton's opinion, a nationwide market definition would render a larger market share and a higher HHI. *Id.* at para. 17. Hamilton's analysis creates a genuine issue of fact regarding the accuracy of the agencies' definition of the product market. On remand, the agencies should consider and resolve this issue on a reasoned basis.

The preceding discussion used plaintiffs' evidence for two purposes. First, I examined plaintiffs' extra-record evidence in order to educate myself regarding the issues and background of this case. This enables me to evaluate the evidence in the administrative record. *See Asarco, Inc. v. United States Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir.1980); *MGPC, Inc. v. Duncan*, 581 F.Supp. 1047, 1059 (D.Wyo.1984), *rev'd on other grounds*, 763 F.2d 422 (Temp.Emer.Ct.App.1985), *appeal pending.* Second, I examined plaintiffs' evidence in order to determing the adequacy of the administrative record. *See Asarco, Inc.*, 616 F.2d at 1159–60; *MGPC, Inc.*, 581 F.Supp. at 1058–59; *cf. Motor Vehicle Manufacturers Association*, 463 U.S. at 43, 103 S.Ct. at 2866 (agency must consider all relevant factors). My use of extra-

(5) whether the participants have in the past effectively coordinated domestic price levels or output rates; and
(6) whether domestic demand is stable or variable.
*See* Revised Guidelines, 50 Fed.Reg. 1786, 1795 (1985).

The Justice Department's merger guidelines enumerate a variety of similar factors. These include the homogeneity of the product, the degree of difference between the products and locations in the market and next best substitutes, the distance between the sellers and the next-most-distant seller, the similarities and differences in the products and locations of the merging firms, information about specific transactions and buyer market characteristics, the ability of small or fringe sellers to increase sales, the conduct of firms in the market, market performance, and efficiencies. *See* Merger Guidelines, 49 Fed.Reg. 26823, 26832–34 (1984).

**21.** This is not to say that the agencies looked at *solely* the Gulf region, *see, e.g.,* A.R. at 431–33 (geographic markets analysis). Nonetheless, the Gulf region was the focus of their economic analysis and was the market used for their HHI calculations. *See* A.R. at 426.

record evidence is therefore limited to understanding and evaluating the administrative record. Using plaintiffs' evidence in this manner, I conclude that there are genuine issues of material fact which must be resolved by the agencies upon remand. In other words, my understanding and evaluation of this case, in light of the plaintiffs' evidence, is that the agencies' analysis presently is unclear and incomplete.

Even looking at the administrative record alone, I find that the agencies have not articulated a satisfactory explanation for Chlor/Alkali's certification that makes a rational connection between the facts found and the choice made. *See Motor Vehicle Manufacturers Association*, 463 U.S. at 43, 103 S.Ct. at 2866. Thus, on the administrative record alone, there are genuine issues of material fact remaining in this case.

The first such issue concerns Chlor/Alkali's certification for export conduct related to chlorine. Chlorine is difficult to store and transport, *see* A.R. at 248. Thus, it is rarely exported. In 1983, for example, exports of chlorine constituted only one percent of total sales, *see id.* at 431. Chlor/Alkali acknowledged that it did not expect to export chlorine. *See* A.R. at 325. While it stated that it might export chlorine in the future, it sought certification for chlorine primarily on the ground that the chlor-alkali market is "chlorine-driven" and caustic soda exports therefore cannot meaningfully be discussed independently of chlorine. *See id.* at 310. Thus, despite minimal industry chlorine export activity, and despite Chlor/Alkali's acknowledgement that it would not export chlorine, the agencies certified Chlor/Alkali with respect to chlorine as well as caustic soda.

The Act clearly limits certification to export conduct. *See* 15 U.S.C.A. § 4012 (application must specify conduct "limited to export trade"); *id.* at § 4013 (certificates pertain to export trade, export trade activities, and methods of operation). The Act's definitions emphasize its limitation to ex-

port conduct. " '[E]xport trade' ... means trade or commerce in goods ... exported, or in the course of being exported...." 15 U.S.C.A. § 4021(1). "[E]xport trade activities' means activities or agreements in the course of export trade...." *Id.* at § 4021(3). " '[M]ethods of operation' means any method by which a person conducts or proposes to conduct export trade...." *Id.* at § 4021(4). Agency guidelines explicitly stated at the time of Chlor/Alkali's certification that "[c]onduct that does not constitute export trade, export trade activities or methods of operation is not eligible for certification." *See* Initial Guidelines, 48 Fed.Reg. 15937, 15938 (1983). Present guidelines reiterate this limitation. *See* 50 Fed.Reg., *supra*, at 1789–90.

Given the explicit terms of the Act and the agencies' own guidelines, their certification of Chlor/Alkali with respect to chlorine is puzzling. The puzzle is made all the more problematic by the agencies' HHI calculations. Based upon the geographic market defined by the agencies, chlorine has a market concentration of 2248. *See id.* at 426. The agencies recognized that this figure denotes a concentrated market "substantially above" the "cut-off for concentrated markets as defined in the D[epartment] O[f] J[ustice] merger guidelines." *Id.* Moreover, if the joint venture is analyzed as a merger, it yields a post-merger increase in concentration of 92. *See id.* at 427. This figure places the joint venture in the category of mergers that the Department of Justice is "likely to challenge." *See* 49 Fed.Reg., *supra*, at 26825. Furthermore, it comes quite close to the category of mergers in which "only ... extraordinary cases" present "other factors" establishing that the merger is unlikely substantially to lessen competition.[22] *Id.*

Although the agencies recognized that "the structural characteristics for the relevant Chlor/Alkali markets suggest a strong potential for oligopolistic problems," they concluded that Chlor/Alkali's "rela-

---

**22.** This category is composed of cases in which "the increase in the HHI exceeds 100 and the post-merger HHI substantially exceeds 1800...." 49 Fed.Reg. 26823, 26825 (1984).

tively small combined market share" thwarts realization of that potential. *See* A.R. at 427. This conclusion was based upon the agencies' belief that "the applicant's members, even acting in concert, would not likely have price setting power as a group in the U.S. Rather, price setting ability in these U.S. markets would require some form of coordination with other U.S. producers." *Id.*

This belief is questionable. The industry's history of anticompetitive, price setting behavior suggests that there is a high potential for "some form of coordination with other U.S. producers." The agencies were aware of this industry history because they knew of the *Pennsalt* and *Alkali* consent decrees, *see* A.R. at 339–41. Those decrees stemmed from antitrust prosecution of major chlor-alkali producers, including Hooker Chemicals, predecessor to Chlor/Alkali member Occidental. *See United States v. United States Alkali Export Association, Inc.,* 86 F.Supp. 59 (S.D. N.Y.1949)(*Alkali* decree entered in 1951); *United States v. Pennsalt Chemicals Corporation,* 260 F.Supp. 171 (E.D.Pa.1966) (*Pennsalt* decree entered in 1967); *United States v. FMC Corporation,* 306 F.Supp. 1106 (E.D.Pa.1969) (remaining *Pennsalt* defendant). The record indicates, however, that the agencies did not treat the decrees as evidence of the industry's history and proclivities for anticompetitive activities. Moreover, as the defendants' counsel conceded at the hearing before me, the agencies did not even determine whether the conduct permitted under the export trade certificate violates the consent decrees.

Based upon these omissions, I find that the administrative record is inadequate in its consideration of Chlor/Alkali's eligibility for certification. The minimal level of chlorine exports, coupled with the anticompetitive tendencies signalled by the HHI calculations for chlorine and the industry history, poses a genuine material factual issue precluding summary judgment; that is, the agencies should consider the possibility that Chlor/Alkali sought certification for chlorine as a sham to facilitate, and

insulate, anticompetitive domestic practices.

The administrative record also raises issues concerning Chlor/Alkali's certification with respect to caustic soda. Unlike chlorine, caustic soda is exported in relatively significant quantities. *See* A.R. at 431. HHI calculations reveal a concentration of 1923 for the caustic soda market. Analyzing the joint venture as a merger, the post-merger increase in concentration in the caustic soda market is 140. *See* A.R. at 426–27. These figures place Chlor/Alkali in the category of mergers that the Justice Department is "likely to challenge," *see* 49 Fed.Reg., *supra,* 26825 (post-merger HHI exceeds 1800, and increase is more than 50 points). Furthermore, the numbers arguably place Chlor/Alkali in or near the category in which the Department would challenge all but "extraordinary cases." *See id.* (increase in HHI exceeds 100 and post-merger HHI substantially exceeds 1800). Nonetheless, the agencies concluded that Chlor/Alkali was eligible for certification with respect to caustic soda. This conclusion rested upon the same reasons that were given for Chlor/Alkali's certification with respect to chlorine. *See* A.R. at 427.

I conclude that the present administrative record is inadequate, unclear and incomplete. Given the results of the agencies' HHI calculations, the picture provided by the "other factors" of the chlor-alkali market structure and industry history is crucial to an assessment of Chlor/Alkali's eligibility for certification for both chlorine and caustic soda. Nonetheless, the agencies did not consider the market history signalled by the *Pennsalt* and *Alkali* concert decrees, did not question the certification of chlorine despite minimal exports of that product, and did not have the benefit of the evidence proffered by plaintiffs. For the same reasons, the possibility that the industry's anticompetitive practices may be ongoing is crucial to this case, but it does not appear that the agencies were aware of any of the matters alleged by the plaintiff. The plaintiffs' evidence indicates that additional investigation is necessary in

order to determine whether anticompetitive practices are ongoing and whether the members of the Chlor/Alkali are presently engaging in such practices. As the Hamilton Affidavit suggests, the fact that Chlor/Alkali's certificate permits its members to exchange information makes it important to assess the possibility of ongoing anticompetitive conduct. This is especially true with respect to chlorine.

To this end, the record compiled in the pending FTC proceedings against B.F. Goodrich may be a source of useful evidence. The agencies did not consider VCM and PVC to be a segment of the chlorine industry. The plaintiffs' evidence, particularly the FTC record, suggests that the administrative record may be inadequate in this respect. The agencies should consider whether VCM and PVC are in fact a segment of the chlorine market. If they conclude that this is the case, then the B.F. Goodrich record may be necessary to a complete determination of whether Chlor/Alkali is eligible for certification.

In sum, my review of this case has led me to conclude that the present administrative record is inadequate in a number of respects. Left uncorrected, these inadequacies cause the certification of Chlor/Alkali to fall short of the standards for agency action set forth in *Citizens to Preserve Overton Park* and *Motor Vehicle Manufacturers Association.* It is therefore necessary to vacate the certificate of review and to remand this case to the agencies for further consideration of the issues set forth in this memorandum and order. "The validity of the ... [agencies'] action must ... stand or fall on the propriety of ... [their] finding.... If that finding is not sustainable on the administrative record made, then ... [it] must be vacated and the matter remanded ... for further consideration." *Camp v. Pitts,* 411 U.S. at 143, 93 S.Ct. at 1244 (citing *SEC v. Chenery Corporation,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ).

As I noted earlier, *de novo* review is not appropriate in this case. Thus, while my review has been "thorough, probing [and]

in-depth," *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 415, 91 S.Ct. at 823, determination of the actual merits must be left to the agencies. *See Camp v. Pitts,* 411 U.S. at 143, 93 S.Ct. at 1244; *see also National Association of Metal Finishers v. Environmental Protection Agency,* 719 F.2d 624, 632–33 (3d Cir.1983), *rev'd on other grounds,* — U.S. ——, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985). My review has identified the issues left open by the inadequacies of the administrative record. I leave it to the agencies to determine "how ... [they] may best proceed to develop the needed evidence and how ... [their] prior decision should be modified in light of such evidence as develops." *Federal Power Commission v. Transcontinental Gas Pipe Line Corporation,* 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976) (*per curiam* ). In so doing, I do not require the agencies to follow any specific procedure. *Motor Vehicle Manufacturers Association,* 463 U.S. at 50–51, 103 S.Ct. at 2870–71; *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Counsel, Inc.,* 435 U.S. 519, 544–49, 98 S.Ct. 1197, 1211–14, 55 L.Ed.2d 460 (1978).

I therefore deny the defendants' motions. The certificate of review is vacated, and the matter is remanded to the Secretary of Commerce and the Attorney General in order to consider the issues discussed in the foregoing analysis.

### ORDER

AND NOW, this 3rd day of January, 1986, after a hearing on the Defendants' Motion for Summary Judgment, and the Defendants' Motion to Dismiss, the motions are hereby DENIED for the reasons set forth in the accompanying memorandum. Chlor/Alkali's certificate of review is vacated and the matter is remanded to the Secretary of Commerce and the Attorney General. On remand, the agencies should consider the questions, set forth below, which raise genuine issues of material fact concerning whether the grant of a certificate of review to Chlor/Alkali was arbitrary,

capricious, and an abuse of discretion. These questions are:

1. Whether, taking into account plaintiff's discovery materials, the Hamilton Affidavit and whatever other investigation is reasonably necessary:

a) anticompetitive conspiracies such as those found in the reported cases are still ongoing;

b) the members of Chlor/Alkali are involved in such ongoing anticompetitive conspiracies, and

c) the antitrust exemptions provided in Chlor/Alkali's Export Trade Certificate, notwithstanding its terms, would likely be abused as a cover for antitrust violations.

2. Whether existing consent decrees bar the conduct permitted by Chlor/Alkali's certificate.

3. Whether, assuming that existing consent decrees do not bar the conduct permitted by Chlor/Alkali's certificate, the history of reported antitrust cases suggests that there is a high risk that the Chlor/Alkali's decisions, practices, and arrangements will be used to fix domestic prices.

4. Whether VCM and PVC are a significant segment of the chlorine industry rather than different product markets and, thus, whether the FTC proceeding challenging B.F. Goodrich's acquisition of Diamond Shamrock plants provides useful evidence regarding anticompetitive practices in the chlorine and caustic soda industry that bears upon Chlor/Alkali's conformance with the certification standards set forth in Section 303(a) of The Export Trading Company Act.

5. Whether chlorine exports are so minimal that inclusion of chlorine in the certificate granted to Chlor/Alkali is a sham that permits Chlor/Alkali to engage in domestic anticompetitive conduct.

The present administrative record is inadequate with respect to the genuine issues of material fact raised by the foregoing questions. In order to complete the administrative record, it is necessary to remand this case to the agencies for their reasoned analysis of the issues. The issues embrace factors relevant to Chlor/Alkali's eligibility for certification; a failure to consider these factors would be an error of judgment. Certification of Chlor/Alkali without the agencies' consideration of them would be an abuse of discretion, as well as arbitrary and capricious, because important aspects of the matter would have been ignored. Therefore, the Motion for Summary Judgment is DENIED.

The Motion to Dismiss is DENIED because the concurrence of the Attorney General is required to grant an export trade certificate of review; therefore, the Attorney General's action is subject to review as a part of the determination of the Secretary.